UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

− − − − − − − − − − − − − −— − − − − − − − − − − −  x

GAETANO DEVELOPMENT CORP., GATEWAY
IV, LLC, and HARTFORD FIRE INSURANCE
COMPANY a/s/o Gateway IV, LLC,

                               Plaintiffs,

               -against-

GOODMAN MANUFACTURING COMPANY, L.P.,
GOODMAN COMPANY, L.P. and GOODMAN
GLOBAL, INC.,

                             Defendants.

Case No. 09-CV-10090
(Consolidated)

− − − − − − − − − − − − − − − − −— − − − − − − −  x

GOODMAN COMPANY, L.P.,

                     Third-Party Plaintiff,

               -against-

TOWER MANUFACTURING CORPORATION,

                    Third-Party Defendant.

− − − − − − − − − − − − − −— − − − − − − − − − − −  x

TOWER MANUFACTURING CORPORATION,

                Second Third-Party Plaintiff,

               -against-

EVEREX COMMUNICATIONS, INC., PRIME
TECHNOLOGY (GUANGZHOU), INC.,
CONNECTICUT PTAC SERVICES, LLC, and
COOL TECH HVAC SERVICE, LLC

              Second Third-Party Defendants.

− − − − − − − − − − − − − − −— − − − − − − − − − −  x

**TOWER MANUFACTURING CORPORATION'S MEMORANDUM OF LAW IN**
**OPPOSITION TO EVEREX AND PRIME'S MOTIONS FOR SUMMARY JUDGMENT**

1

## Table of Contents

**PRELIMINARY STATEMENT**.................................................................................1

**STATEMENT OF FACTS** ...................................................................................1

**ARGUMENT** ..........................................................................................................2

**Point I**.................................................................................................................2

THE SUMMARY JUDGMENT STANDARD..................................................2

**Point II**...............................................................................................................3

TOWER IS NOT A "SETTLING PARTY" UNDER NY GOL § 15-108 AND
THEREFORE ITS CONTRIBUTION CLAIMS SURVIVE THE GOODMAN
SETTLEMENT ................................................................................................3

**Point III**.............................................................................................................4

TOWER'S COMMON LAW INDEMNIFICATION CLAIMS AGAINST EVEREX AND
PRIME ARE NOT WAIVED UNDER NY GOL § 15-108 .............................4

**Point IV**.............................................................................................................6

SUMMARY JUDGMENT SHOULD BE DENIED AS TO EVEREX AND PRIME
BECAUSE QUESTIONS OF FACT EXIST ON CAUSATION.....................6

   A.   The "loose crimp connection" theory advanced by Everex and Prime is based
on a highly remote and speculative chain of events. ........................... ...6

   B.   The "loose crimp connection" theory advanced by Everex and Prime is not
supported by the facts or physical evidence..........................................7

   C.   Tests of loose crimp connections demonstrate that a loose crimp will not
result in damage to the M61 ................................................................10

   D.   All three fires were caused by Everex and/or Prime's failure to adequately
space the Line 2 and Compressor high voltage circuits as required by UL 873. ....11

     i.   Surface arc tracking tests performed on the M61 confirm that the Line 2
and Compressor circuits are of opposite polarity and are prone to electrical
arcing due to inadequate spacing between the circuits. ......................14

**CONCLUSION** ................................................................................................16

## <u>Table of Authorities</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................ 2

*Cohn v. Lionel Corp.,*
   21 N.Y.2d 559, 289 N.Y.S.2d 404, 236 N.E.2d 634 (1968) ......................... 5

*Colrer v. K Mart Corp.,*
   709 N.Y.S.2d 758 (N.Y.App.Div.2000) ....................................................... 5

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*,
   902 F.2d 174 (2d Cir. 1990) ....................................................................... 2

*Donahue v. Windsor Locks Bd. of Fire Comm'rs,*
   834 F.3d 54 (2d Cir. 1987) ......................................................................... 2

*Madaffari v. Wilmod Company, Inc.,*
   96 Misc.2d 729, 409 N.Y.S.2d 587 (Sup. Ct. N.Y. 1978) ............................ 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ................................ 2

*McHugh v. International Components Corp.,*
   118 A.D.2d 762, 500 N.Y.S.2d 152 (2d Dep't 1986) ................................... 4

*Repp & K & R Music, Inc. v. Webber,*
   132 F.3d 882 (2d Cir.1997) ......................................................................... 2

*Rosado v. Proctor & Schwartz, Inc.,*
   66 N.Y.2d 21, 494 N.Y.S.2d, 851, 852 (1985) ......................................... 3, 4

*Scarangella  v. Thomas Built Buses, Inc.,*
   93 N.Y.2d 655, 659, 695 N.Y.S.2d 520  (1999) .......................................... 16

*Voss v. Black and Decker Mfg. Co.,*
   59 N.Y.2d 102, 107, 463 N.Y.S.2d 398 (1983) .......................................... 16

**Statutes**

Fed.R.Civ.P. 56 ................................................................................................ 2

New York General Obligations Law  § 15-108 ................................................ 1, 3, 4, 5

## PRELIMINARY STATEMENT

Third-Party Defendant/Second Third-Party Plaintiff, Tower Manufacturing Corporation ("Tower"), respectfully submits this memorandum of law in opposition to the summary judgment motions filed by second third-party defendants, Everex Communications, Inc. ("Everex") and Prime Technology (Guangzhou), Inc. ("Prime") (collectively "Second Third-Party Defendants) seeking  dismissal of Tower's Second Third-Party Complaint.

Everex and Prime's motions should be denied because 1) Tower is not a "settling party" under New York General Obligations Law (NYGOL) § 15-108(c) and therefore its contribution claims survive the Goodman settlement; 2) Tower's common law indemnification claims survive irrespective of the operation of NYGOL § 15-108(c); 3) the causation theory that a loose crimp connection on Tower's power cord caused all three fires is speculative, based on a remote chain of events and is contradicted by the evidence; and 4) the evidence demonstrates, or at a minimum questions of fact exist, that Everex's failure to space the Line 2 and Compressor high voltage circuits on the M61 circuit board with the minimum ¼ inch (6.44 mm) safety margin required by UL caused or contributed to the PTAC fires.

## STATEMENT OF FACTS

Facts in opposition to Everex and Prime's motions are set forth in Tower's Opposition to Everex and Prime's Local Rule 56.1 Statements, which accompanies this memorandum of law, as well Tower's Statement of Material Facts pursuant to Local Rule 56.1 submitted in support of its summary judgment motion against Goodman.

## ARGUMENT

### POINT I

### THE SUMMARY JUDGMENT STANDARD

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment when there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A motion for summary judgment may only be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden of proving that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.3d 54,  57 (2d Cir. 1987).  When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant…and draw all reasonable inferences in its favor."  *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990).

If the court finds that there are factual disputes regarding material issues, summary judgment is not appropriate. *See Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997) ("Clearly, the duty of a court on a motion for summary judgment is ... not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution.")

2

**POINT II**

**TOWER IS NOT A "SETTLING PARTY" UNDER NY GOL § 15-108 AND THEREFORE ITS CONTRIBUTION CLAIMS SURVIVE THE GOODMAN SETTLEMENT**

NY GOL § 15-108 addresses the effect a settlement between an injured party and a tortfeasor has on related claims by or against joint tortfeasors who do not participate in the settlement. NY GOL § 15-108 (b) extinguishes any contribution claims against the settling party and § 15-108 (c) extinguishes all contribution claims by the settling party against a nonsettling party.  It states as follows:

§ 15-108. Release or covenant not to sue

(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person.

In the instant matter, Goodman settled the case with plaintiffs and obtained a release from liability in August 2010.  See Exs. I, J, K and L  of O'Hara Declaration.  By settling with plaintiffs, Goodman waived its contribution claims against Tower under New York GOL § 15-108(c).  *Rosado v. Proctor & Schwartz, Inc.,* 66 N.Y.2d 21, 494 N.Y.S.2d, 851, 852 (1985)

Prime and Everex do not dispute that Tower did not participate in the Goodman settlement and never obtained a release from liability from any party to this action.  See Everex Rule 56.1 Statement, ¶ 9-14; Prime Rule 56.1 Statement, ¶ 20.  Ignoring this key fact, Everex and Prime misapply New York GOL § 15-108 to argue that Goodman's

settlement with plaintiffs somehow extinguishes Tower's right to seek contribution from Everex and Prime.   There is no basis for Everex and Prime's position.  NY GOL § 15-108(c) states that only a party "**who has obtained his own release from liability** shall not be entitled to contribution from any other person."  [Emphasis added].  Since Tower never obtained a release from liability, its contribution claims against Everex and Prime survive.

The cases cited by Everex and Prime relating to the dismissal of third party claims for contribution following a settlement are not on point.  These cases all address a party who already obtained a release from liability.  *See, e.g. McHugh v. International Components Corp.*, 118 A.D.2d 762, 500 N.Y.S.2d 152 (2d Dep't 1986); *Madaffari v. Wilmod Company, Inc.*, 96 Misc.2d 729, 409 N.Y.S.2d 587 (Sup. Ct. N.Y. 1978). None of the cited cases stand for the proposition that NY GOL § 15-108© bars a *non-settling* third-party plaintiff, such as Tower, from pursuing contribution claims against others responsible in whole or in part for a loss.    Moreover, to the extent a jury needs to assign percentages of fault between the parties for the purpose of allocating liability, the Court can craft an appropriate charge and jury verdict form in that regard.  See *Madaffari*, supra.   Accordingly, Everex and Prime's motions for summary judgment seeking dismissal of Tower's contribution claims should be denied.

## POINT III

## TOWER'S COMMON LAW INDEMNIFICATION CLAIMS AGAINST EVEREX AND PRIME ARE NOT WAIVED UNDER NY GOL § 15-108

The right to indemnity arises out of a contract, may be implied by law or may by statutorily based.  *Rosado v. Proctor & Schwartz, Inc.*, 484 N.E.2d 1354, 494 N.Y.S.2d

851 (1985).  Unlike contribution, where the loss is distributed among tort-feasors, with indemnity the party held legally liable shifts the entire loss to another.  *Id.* At 853.  The right of common law indemnification belongs to parties found vicariously liable *without proof of any negligence or active fault on their own part.* [Emphasis added] *Colrer v. K Mart Corp.,* 709 N.Y.S.2d 758, 759 (N.Y.App.Div.2000).   Although NY GOL § 15-108(c) bars contribution claims by a settling party, it leaves intact any indemnification claims the party may have.  See NY GOL § 15-108(c).

Here, Tower's third-party complaint seeks both contribution and common law indemnity from Everex and Prime.  See  Ex. F to Haworth Dec. in Support of Summary Judgment.  This is entirely proper in that it is well-settled that "a plaintiff is entitled to advance inconsistent theories in alleging a right to recovery."  See *Cohn v. Lionel Corp.,* 21 N.Y.2d 559, 563, 289 N.Y.S.2d 404, 236 N.E.2d 634 (1968).   As will be set forth in detail below, Tower has evidence that defects in the M61 designed by Everex and manufactured by Prime were either the sole or a contributing cause of the PTAC fires. Therefore, to the extent Goodman is entitled to indemnity from Tower on any of its theories, which Tower denies given evidence that Goodman is not free from fault, a jury could find that Prime and/or Everex is wholly responsible and must indemnify Tower for any portion of the damages owed by Tower to Goodman.   Accordingly, Everex and Prime's motions for summary judgment seeking dismissal of Tower's indemnification claims should be denied.[1]

---

[1] Tower withdraws its claim for contractual indemnification against Everex and Prime since discovery has shown that there was no contractual agreement between these parties.

5

## POINT IV

## SUMMARY JUDGMENT SHOULD BE DENIED AS TO EVEREX AND PRIME BECAUSE QUESTIONS OF FACT EXIST ON CAUSATION

Everex and Prime move for summary judgment arguing that all of the fires at plaintiff's building were caused by a claimed "defective loose crimp connection on Tower's power cord." (Everex Memorandum of Law, p. 11; Prime Memorandum of Law, p. 11)  Their motions should be denied because the claim that a loose crimp connection caused all three fires is speculative and contradicted by the evidence.  Further, Tower has come forth with evidence showing that the fires were caused by a defect with the M61 circuit board rather than Tower's power cord or, at the very least, Tower has shown that questions of fact exist on causation sufficient to deny the motions.

### A.    The "loose crimp connection" theory advanced by Everex and Prime is based on a highly remote and speculative chain of events.

Everex and Prime argue that a loose crimp connection caused all three fires at plaintiff's building.  Their causation theory is based on a chain of remote events that need to have occurred not just once but in three separate fires.  First, the power cord's crimp connection on a particular PTAC unit had to have been sufficiently loose to cause a rise in temperature beyond normal; second, the temperature rise needs to be high enough to liquefy the wire's PVC insulation; third, enough PVC insulation, which is not located directly above the M61, needs to fall off the wire and deposit itself exactly between the Line 2 and Compressor pads so as to provide a path for arcing to occur; fourth, the damage to the M61 boards, in at least the two fires in apartments 4B and 6B, had to have been missed by two independent Goodman-hired service technicians who had replaced power cords and examined the circuit boards prior to the fires; and finally,

6

the arcing must be continuous and severe enough to result in ignition of the M61 circuit board.  It is clear that this chain of events is highly remote and unlikely to have occurred on three separate occasions.

### B. The "loose crimp connection" theory advanced by Everex and Prime is not supported by the facts or physical evidence.

There is no dispute that two of the PTAC fires in May 2009 (Apt. 6B) and February 2010 (Apt. 4B) involved new power cords of which there is no claim of an improper crimp.  See Deposition of Andrew Diamond, p. 256-257 at Ex. R to Haworth Dec. in Support of Summary Judgment; Eberhardt Rpt., p. 3 at Ex. G to Haworth Dec. in Support of Summary Judgment.  Nevertheless, Everex and Prime argue that the fires in these apartments occurred, despite the presence of new cords, because the circuit boards already sustained burn damage from the pre-recall cords. See Glover Affidavit, ¶ 19, Sy Declaration, ¶ 8.   Everex's expert, Duncan Glover, Ph.D., hypothesizes that a loose crimp connection from the prior cord caused overheating and led to melted deposits of PVC insulation being deposited exactly between the Line 2 and Compressor circuits causing arcing to occur.  See Glover Affidavit, ¶ 5, 11 and 20.  However, neither Everex nor Prime can explain why two trained, service technicians missed the claimed damage when they were installing new power cords in apartments 4B and 6B prior to these fires.  This work required direct observation of the area where they claim pre-existing damage would have been present i.e. at the Line 2 and Compressor terminals on the circuit board.

For example, Kenneth Shanklin of Connecticut PTAC installed a new power cord in the PTAC unit in apartment 6B on May 18, 2009 just several hours prior to the fire in

that PTAC unit. He testified that he did not recall seeing damage to the M61 circuit board and, if he had, he would have replaced the circuit board in that unit.  See Deposition of Kenneth Shanklin, p. 119   at Ex. P to Haworth Dec. in Support of Summary Judgment.  He testified as follows:

> Q. So if you had seen damage to the circuit boards on any of the units at the Gateway, it would have been your practice to replace the circuit board, correct?
>
> A. Yes.
>
> Q. So the fact that, for penthouse B [6B] there's no evidence of a circuit board being replaced there, that would mean you did not observe any damage to the circuit board in that unit, correct?
>
> A. Yes.
>
> Shanklin Dep., p. 116-117
>
> * * *
>
> Q. …Did you see any damage to any of the PTAC units you inspected?
>
> A. No.
>
> Shanklin Dep., p. 119

Notably, Mr. Shanklin was experienced in this work as he had been replacing power cords in Goodman PTAC units all along the East Coast prior to working at plaintiff's building.  If the M61 circuit board in apartment 6B had burn damage as claimed by Everex and Prime, there is no reason why Mr. Shanklin would have missed it.  Notably, one of Goodman's experts testified that the circuit board damage he observed on units that had not been involved in PTAC fires was open and obvious. See Deposition of Andrew Diamond, p. 254-255 at Ex. R to Haworth Dec.  in Support of

Summary Judgment.  Yet, if this is true and the damage was easily observable, it could not have been missed by Mr. Shanklin directly contradicting Everex and Prime's causation theory.

The same holds true for the fire in apartment 4B in February 2010.  Prime and Everex cannot explain how another service technician, Vincent Croce of Cool Tech, also missed claimed pre-existing damage to the M61 circuit board in apartment 4B prior to the February 2010 fire. Like Mr. Shanklin, Mr. Croce testified that he did not recall observing damage to the M61 circuit board while replacing the power cord.  <u>See</u> Deposition of Vincent Croce, p. 35, 41 at Ex. Q to Haworth Dec. in Support of Summary Judgment.

As to the cause of the fire in 2B, there is no evidence that a loose crimp connection on Tower's power cord caused this fire.  Neither Everex nor Prime have provided any photographs or other evidence showing that the power cord's black wire crimp connection in the PTAC unit in apartment 2B was loose or inadequate.  There is no evidence that their experts even recovered the crimp let alone examined it.  In fact, one of Goodman's experts who had examined the 2B PTAC unit testified that he could not draw any conclusions as to the cause of the fire because the M61 circuit board was too burnt and he did not even recall seeing the power cord for the PTAC unit in apartment 2B.  See Diamond Dep., p. 151-154 at Ex. R to Haworth Dec. in Support of Summary Judgment.

In addition, there is evidence that pre-recalled power cords had adequate crimp connections.   Andrew Neuhalfen, Ph.D., an electrical engineer retained by Tower, opines based on his examination of photographs of the cross-sections of various crimp connections from pre-recalled cords that there was "adequate compression of the wire strands for the copper conductors within the barrel of the crimp connection" and that "deformation of the wire strands of the black conductor was proper for an acceptable and reliable electrical connection and mechanical connection of a crimp terminal."   See Neuhalfen Rpt., p. 7-9 at Ex. A to Haworth Dec. in Opposition to Summary Judgment. He also examined photographs of power cords recovered from the PTAC fires at plaintiff's building.   Based on said examination, he opines that the power cord had not exhibited melt prior to being exposed to heat from an external fire and the characteristics of the damage to the insulation is not associated with the operation of an improper crimp connection.   Id. at p. 6.   This evidence directly contradicts Everex and Prime's causation theory involving a loose crimp connection causing the melting of the power cord's PVC insulation.

### C.   Tests of loose crimp connections demonstrate that a loose crimp will not result in damage to the M61

Despite numerous tests, no one has been able to recreate an overheating event or fire from a loose crimp connection.   Both Goodman and Tower tested various power cords with different degrees of loose crimp connections to determine whether a loose crimp connection could cause a sufficient rise in temperature to damage the M61 circuit board and cause a fire.   These tests demonstrate that, even with a significantly loose crimp connection, the connector will not heat up to any significant degree to cause damage to the M61 let alone a temperature rise of 1800 F as claimed by Everex's

expert.   See Eberhardt Rpt., p. 3-4 and 7 at Ex. G, Rao Dec. ¶ 13 and Ex. 4 to Rao

Dec. at Ex. H; Gregory Dep., p. 119 at Ex. I.

Glowing hot connector tests were also performed by Dr. Eberhardt, an expert in

circuit board failure analysis retained by Tower, to determine whether an artificially

heated connector on the power cord would cause damage when plugged into the M61.

Dr. Eberhardt used a glow wire to heat the power cord's connector to 750 degrees

Fahrenheit as it was attached to the Line 2 terminal of the M61.  His tests showed that

even source temperatures of 750 degrees Fahrenheit when applied to the crimp

connector fail to produce charring or arcing of the M61 circuit board. See Eberhardt

Rpt., p. 6-7 at Ex. G to Haworth Dec. in Support of Summary Judgment.

### D.   All three fires were caused by Everex and/or Prime's failure to adequately space the Line 2 and Compressor high voltage circuits as required by UL 873.

UL 873 provides that the minimum spacing between high voltage circuits, such

as the Line 2 and the Compressor line on the M61 circuit board, shall be a minimum of

¼ inch or 6.44 mm.   See Eberhardt Rpt., p. 6-7 at Ex. G to Haworth Dec. in Support of

Summary Judgment and UL 873 at Ex. 2 to Eberhardt Rpt.  However, *the spacing on*

*the M61 circuit board between the Line 2 and the Compressor circuits is .008*

*inches or 2.0 mm which does not comply with UL requirements* or the documents

submitted by Everex to gain UL approval for the M61 circuit board. See Eberhardt Rpt.,

p. 4.   Tower has submitted expert affidavits showing that the lack of spacing caused the

three PTAC fires.  See Eberhardt Rpt. at Ex. G to Haworth Dec. in Support of Summary

Judgment and Neuhalfen Rpt. at Ex. A to Haworth Dec. in Opposition to Summary

Judgment.

11

Everex argues that the ¼ inch spacing requirement set forth in UL 873 does not apply because the Line 2 and Compressor circuits are controlled by a relay that, when closed, equalizes the voltage between the two circuit and makes the two circuits of similar polarity.  <u>See</u>  Glover Affidavit, ¶ 14 and 15.  With two circuits of the same polarity, a footnote to UL 873 applies allowing for a lesser distance between the two circuits. Id.

However, Everex misapplies the spacing requirement set forth under UL 873. <u>See</u> Neuhalfen Rpt., p. 6-7 at Ex. A to Haworth Dec. in Opposition to Summary Judgment; Eberhardt Rpt., p. 3, 5-6 at Ex. G to Haworth Dec. in Opposition to Summary Judgment.    The wiring diagrams of the PTAC show that there are operational modes when the relay is open and the Line 2 and Compressor circuits are at opposite polarity requiring a spacing of ¼ inch distance apart to comply with UL 873.  Id.  Just because there are certain modes where there is similar polarity between the two circuits does not mean that the board can be designed as if the unit always operates in these modes.

The M61's UL certification report also contradicts Everex's position. Page 3 of the M61's UL report specifically states that:

> This device has been judged on the basis of the required spacings in the Standard for Temperature-Indicating and Regulating  Equipment, UL 873, Eleventh Edition, Table 32.1, Column D.

Page 4 of the report states:

> Unless otherwise noted in this Report, the spacings in circuits rated 300 V or less between uninsulated live parts of opposite polarity…are not less than…¼ inch (6.44 mm) over surface.

> <u>See</u> M61 UL Report at Ex. C to Haworth Dec. in Opposition to Summary Judgment.

There is no reference anywhere in the UL report that a footnote to UL 873 applies allowing the spacing of the Line 2 and Compressor circuits to be less than ¼ inches apart.  Id.

Brent Gregory, Goodman's Senior Design Engineer, also testified, contradicting Everex's position, that the Line 2 and Compressor circuits are of opposite polarity. While being questioned about why Goodman asked Everex to widen the spacing between the circuits following reports of overheating, he testified as follows:

> Q.    What was the concern with spacing in relation to the board overheating?
>
> A.    **If these traces of opposite polarity** were too close to each other that they could be bridged, if there was insufficient insulation between them by an arc, that would be a concern.
>
> * * *
>
> Q.    And it's a fair statement that, if there's inadequate spacing between two high voltage circuits of opposite polarity, that can cause arcing on a board, correct?
>
> A.    Yes.
>
> See Gregory Dep., p. 100-101 at Ex. I to Haworth Dec. in Support of Summary Judgment. [Emphasis added]

While Everex now claims that it did not have to comply with the ¼ inch spacing requirement of UL 873 because of an exception regarding circuits of opposite polarity controlled by a relay, its claims ring hollow.  Its witnesses testified that when Everex designed the M61 in 2004 it had no prior experience designing a circuit board for an air conditioning unit, did not rely on UL 873 in designing the spacing of the board and did not even have a full copy of the UL 873 standard.  See Sy Dep., p. 74-75, 102 at Ex. L

13

to Haworth Dec. in Support of Summary Judgment, Chan Dep., p. 15-16, 35 at Ex. B to Haworth Dec. in Opposition to Summary Judgment.

Moreover, to the extent Everex wants to rely on the UL certification to justify its spacing, there is no evidence that UL evaluated the spacing of the M61 circuit board let alone tested the M61 in a fully functioning and wired PTAC unit so as to determine whether there were certain operational modes when the Line 2 and Compressor circuits would be of opposite polarity and therefore would need to be spaced at a minimum ¼ apart.  Vincent Chan, who was responsible for Everex's submission to UL, testified that he did not even know what testing UL performed of the M61 circuit board.  See Chan Dep., p. 28 at Ex. B to Haworth Dec. in Opposition to Summary Judgment.

        **i.**     **Surface arc tracking tests performed on the M61 confirm that the Line 2 and Compressor circuits are of opposite polarity and are prone to electrical arcing due to inadequate spacing between the circuits.**

Surface arc tracking tests performed by Dr. Eberhardt, using generally accepted methodology to evaluate the adequacy of board spacing and a board's propensity to arc, show evidence of charring, arcing and burning along the trace separation between the Line 2 and Compressor circuits on the M61.  See Eberhardt Rpt., p. 6 at Ex. G to Haworth Dec. in Support of Summary Judgment.   Dr. Eberhardt observed that the pattern of damage to the M61 was very characteristic of the failed M61 circuit boards in apartments 2B, 4B and 6B of plaintiff's building.   Id.  He concluded that Everex's failure to provide adequate spacing leaves no margin of error and makes the M61 prone to arc tracking should the space between the Line 2 and Compressor circuits become contaminated with moisture, dust, other contaminants from the manufacturing process

14

or even claimed PVC deposits from melted insulation.  See Neuhalfen Rpt., p. 6-7 at Ex. A to Haworth Dec. in Opposition to Summary Judgment; Eberhardt Rpt., p. 5 at Ex. G to Haworth Dec. in Support of Summary Judgment. Had the M61 been designed to comply with UL's ¼ inch spacing requirement, it would have had the necessary margin of error to avoid the risk and the resulting PTAC fires.  Id.

Dr. Eberhardt and Dr. Neuhalfen's opinion that inadequate electrical spacing is causing arcing between the Line 2 and Compressor circuits of the M61 and the subsequent PTAC fires is not a novel concept.  Goodman in its initial analysis of M61 overheating problems as early as 2008 raised inadequate spacing of the M61 circuit board as a potential cause for overheating PTACs.  See PTAC Board Review (GDMN 385, 1232) at Ex. M to Haworth Dec. in Support of Summary Judgment.  Also, in an internal review of the M61 following several overheating events, one of the corrective actions suggested was to broaden the spacing or mill a gap between the Line 2 and Compressor circuits.  See Action Item List (GDMN 1232) at Ex. O to Haworth Dec.; See Sy Dep., p. 127-128 at Ex. L to Haworth Dec. in Support of Summary Judgment.  Also, Alex Sy of Everex testified that when Everex initially designed the M61 based on a prior design, it decided to broaden the spacing as a safety consideration.  Id. at p. 79-80.  Unfortunately, Everex did not go far enough to comply with the UL 873 spacing requirement.

Given the foregoing, Everex and Prime's motions for summary judgment on the merits should be denied.  Further, to the extent Prime argues it is entitled to summary judgment because it only manufactured the M61 but did not design it, there is no basis for Prime's position.  It is well settled that a manufacturer can be held liable for selling a

15

defectively designed product because the manufacturer "is in the superior position to discover any design defects and alter the design before making the product available to the public"  See *Scarangella  v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520  (1999) citing *Voss v. Black and Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398 (1983).

## **CONCLUSION**

For the foregoing reasons, Tower respectfully requests that Everex and Prime's motions for summary judgment be denied in their entirety.


Dated:      New York, New York
            February 28, 2011


_____
Scott L. Haworth (SH-3890)
Barry L. Gerstman (BG-3691)
HAWORTH COLEMAN & GERSTMAN LLC
45 Broadway, 21st Floor
Telephone: (212) 952-1100
Facsimile: (212) 952-1110
Attorneys for Third-Party Defendant/
Second Third-Party Plaintiff
Tower Manufacturing Corporation

## <u>CERTIFICATE OF SERVICE</u>

I, Scott L. Haworth, hereby certify and affirm that a true and correct copy of the attached **TOWER MANUFACTURING CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO EVEREX AND PRIME'S SUMMARY JUDGMENT MOTIONS** was served via ECF on February 28, 2011, upon the following:

Dennis Perlberg, Esq.
SPEYER & PERLBERG, LLP
Attorneys for Second Third-Party Defendant
Everex Communications, Inc.
115 Broadhollow Road, Suite 250
Melville, New York  11747

Steven Bennett, Esq.
Maxime Guindo, Esq.
JONES DAY
Attorneys for Defendants/Third-Party Plaintiffs
Goodman Global, Inc., Goodman Company, L.P.
and Goodman Manufacturing Company, L.P.
222 East 41st Street
New York, New York  10017

Michael J. Dougherty, Esq.
WELTMAN, WEINBERG & REIS, CO., L.P.A.
Attorneys for Second Third-Party Defendant
Prime Technology (Guangzhou), Inc.
325 Chestnut Street, Suite 501
Philadelphia, PA 19106

Dated: New York, New York
        February 28, 2011

_____
Scott L. Haworth (SH-3890)
Barry L. Gerstman (BG-3691)
HAWORTH COLEMAN & GERSTMAN LLC
45 Broadway, 21st Floor
Telephone: (212) 952-1100
Facsimile: (212) 952-1110
Attorneys for Third-Party Defendant/
Second Third-Party Plaintiff
Tower Manufacturing Corporation